986 F.2d 1422
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
John M. SNYDER, Jr., Plaintiff-Appellant,
v.
NORFOLK & WESTERN RAILWAY COMPANY, Defendant-Appellee.
 No. 91-4109.
 United States Court of Appeals, Sixth Circuit.
 Feb. 5, 1993.
 
 Before NATHANIEL R. JONES and RYAN, Circuit Judges, and JOHN W. PECK, Senior Circuit Judge.
 PER CURIAM.
 
 
 1
 Plaintiff-Appellant John M. Snyder, Jr., appeals from the entry of judgment pursuant to a jury verdict which found Defendant-Appellee Norfolk & Western Railway Company ("N & W") not liable for injuries Snyder sustained on the job as an employee of N & W. He claims that certain irrelevant, confusing, cumulative, and prejudicial evidence was erroneously admitted, thus warranting a new trial. We find no error giving rise to reversal and thus affirm the decision of the district court.
 
 I. The Case
 
 2
 Snyder was a railroad brakeman for N & W for many years. On March 16, 1988, he sustained spinal injuries while "throwing" a "derail" as part of his job. In November and again in December of 1988, he underwent spinal surgery. After the accident, Snyder became addicted to pain killers, and returned to the heavy consumption of alcohol after a lengthy hiatus from it.
 
 
 3
 Snyder originally filed his Complaint against N & W in the United States District Court for the Eastern District of Pennsylvania on July 14, 1989. Alleging negligence, he sought money damages for allegedly permanently disabling injuries sustained during the course and within the scope of his employment. "[G]reat physical pain and mental anguish" were alleged in the Complaint. J.A. at 9.
 
 
 4
 On December 14, 1989, the action was transferred to the United States District Court for the Southern District of Ohio. On October 7, 1991, a jury trial began. During counsel for Snyder's opening statement, Snyder's association with alcohol and drugs was discussed:
 
 
 5
 ... John Snyder is an alcoholic. He started to drink at the age of nine.
 
 
 6
 He came from an alcoholic family. He will tell you that. He will tell you in the 70's he had had more bouts with alcohol than you can imagine. He went in and out of detox hospitals. He lost his job on the railroad. He was caught sleeping on the job....
 
 
 7
 * * *
 
 
 8
 Mr. Snyder will tell you [that the specter of back surgery after the accident] scared him to death. This was the beginning, I guess the Fall of '88 was the beginning of Mr. Snyder's real fear and loss of confidence, loss of hope. He did what he hadn't done for eight years: He went and took a bottle of booze and drank it. And Mr. Snyder never took one drink, he couldn't, it was just one bottle after another.
 
 
 9
 That was in October of '88. He wound up in a detox hospital. He took himself there....
 
 
 10
 * * *
 
 
 11
 Well, March of '90 Mr. Snyder was looking ahead to June of '90, stomach stapling surgery. It was over a year after his first surgery. The hope he had had that he was going to be a [sic] 100 percent better by then was gone. Even though he hadn't had a drink since that one bout in October of '88, he did it again. He decided he couldn't go on without a drink and there is no such thing as one drink to Mr. Snyder.
 
 
 12
 He wound up in another detox hospital....
 
 
 13
 * * *
 
 
 14
 [Upon becoming addicted to pain killers,] [h]e wound up in another detox hospital because when he ran out of the medication and couldn't trick anybody else into giving it to him, he hit the bottle. He had to keep that numbness going. He was admitted to Glenbeigh Hospital in May of '91, essentially for a dual detoxification: The drugs, all these prescription drugs, and alcohol.
 
 
 15
 He was in there, got detoxed, was in there two weeks and got let go and Mrs. Snyder will tell you they predicted he would be back and he was back in June for alcoholism, June of '91.
 
 
 16
 Essentially, he was in there for just a couple of days at Firelands Hospital....
 
 
 17
 Id. at 276, 278-79, 281, 283.
 
 
 18
 Snyder took the stand and testified to his falling asleep on the job, his many bouts with alcoholism both before and after the accident, professional treatments of his alcohol addiction both before and after the accident, and his addiction to codeine. See id. at 308, 310, 353, 357-58, 360-61. At one point, he stated, "[After the accident and before the first back surgery,] I started drinking because I was just scared. I was scared and depressed because I wasn't going to be able to go back to the railroad and I couldn't do nothing around the house like I wanted to do, and all kinds of problems." Id. at 352.
 
 
 19
 Snyder's wife, Mary Snyder, also testified to Plaintiff's pre- and post-accident bouts with alcohol and his professional treatments for such abuse. Id. at 477-78, 481-82, 484-85, 490. She also testified to the fact that she had filed for divorce in 1978 because of Plaintiff's drinking problem. Id. at 477.
 
 
 20
 At trial, a great amount of medical evidence was admitted. Much of it concerned Snyder's history of alcohol and drug abuse.
 
 
 21
 At the conclusion of the trial on October 14, 1991, the jury returned a verdict specifically finding N & W to be not negligent. The district court entered judgment in accordance with the jury verdict on October 15, 1991. Snyder timely appealed on November 8, 1991.
 
 II. The Contested Evidence
 
 22
 Snyder argues that the improper admission of certain portions of seven sets[1] of medical documents warrants a new trial:
 
 
 23
 A. Operative Report from the Mount Sinai Medical Center with regard to Snyder's Vertical Banded Gastroplasty on June 5, 1990 (J.A. at 129-30)
 
 
 24
 This report refers to a stomach stapling operation that Snyder underwent for the control of "morbid obesity." Id. at 129. In the report, the surgeon who conducted the operation noted that "[t]he patient has numerous physical problems that are associated probably with the alcohol and the weight related problems." Id. The surgeon noticed evidence of "fatty liver disease and probably early alcoholic liver disease." Id.
 
 
 25
 B. Good Samaritan Hospital Records regarding Snyder's Stay from November 17, 1975 to November 21, 1975 (J.A. at 131-33)
 
 
 26
 These records reflect the fact that Snyder entered the hospital for treatment of alcohol addiction dating from roughly 1972 to 1975. They discuss the fact that Snyder had three marriages end in divorce "because of drinking." Id. at 133.
 
 
 27
 C. Good Samaritan Hospital Records regarding Snyder's Stay from October 15, 1976 to October 17, 1976 (J.A. at 134-36)
 
 
 28
 These records refer to another of Snyder's stays at this hospital due to alcohol addiction. They again refer to three of Snyder's divorces. They also note two "abnormal" blood test findings. Id. at 135.
 
 
 29
 D. Firelands Community Hospital Records regarding Snyder's Stay from October 20, 1988 to October 22, 1988 (J.A. at 137-67)
 
 
 30
 These records refer to Snyder's first post-accident hospital stay. They suggest that Snyder had, inter alia, "renal insufficiency," "hypertension," "gouty arthritis," "anorexia," "clammy hands," "gastritis," and was "morbidly obese." Id. at 138, 142, 144. Results of lab tests revealed numerous abnormalities.
 
 
 31
 E. Lorain Community Hospital Records regarding Snyder's Stay from March 11, 1990 to March 13, 1990 (J.A. at 168-98)
 
 
 32
 These records contain references to Snyder's chemical use history, blackouts, and enlarged liver. The Clinical Resume strangely states that Snyder had "[n]o significant medical problems." Id. at 169. The records also discuss his negative behavior while intoxicated, including being angry and verbally abusive, "slapp[ing] his wife," and "violating his value system." Id. at 186-87.
 
 
 33
 F. Glenbeigh Hospital Records regarding Snyder's Spring 1991 Stay (J.A. at 199-223)
 
 
 34
 These records contain technical comments regarding lab test results and other observations. Observations include, inter alia, references to Snyder's "blackouts," "poor concentration," "memory loss," and "amotivation." Id. at 199.
 
 
 35
 G. Firelands Community Hospital Records regarding Snyder's June 1991 Stay (J.A. at 224-68)
 
 
 36
 These records contain lab results, as well as references to Snyder's appearance (viz., that he "looks well over ten years older than his stated age," has "unkempt" and "dirty" hair, and has "terrible [teeth] hygiene"--id. at 230) and to the fact that he was in a "bad check predicament." Id. at 263.
 
 
 37
 III. Analysis of the Admission of Medical Records
 
 
 38
 Snyder argues that aspects of the admitted medical records were confusing to the jury, cumulative, irrelevant, and/or more prejudicial than probative. He objected to the admission of some of this evidence at trial, and did not object to the admission of other evidence. Our standard of review varies accordingly. Generally, "[w]e review admission of testimony and other evidence by the trial court under the abuse of discretion standard." Mitroff v. Xomox Corp., 797 F.2d 271, 275 (6th Cir.1986). Even if there is an abuse of discretion, a new trial shall not issue unless a substantial right of a party is affected. Fed.R.Civ.P. 61; Rye v. Black & Decker Mfg. Co., 889 F.2d 100, 103 (6th Cir.1989). Where no objection is made to the admission of evidence at trial, however, this court is restricted to reviewing for plain error that affects substantial rights. Fed.R.Evid. 103(d); American Anodco, Inc. v. Reynolds Metals Co., 743 F.2d 417, 424 (6th Cir.1984).
 
 A. Confusing and Cumulative Evidence
 
 39
 Snyder claims that certain lab test results found in the admitted medical records confused the jury because no medical expert was called on to explain them. He also argues that such evidence was improperly admitted because it was mere cumulative evidence. Snyder objected to some of these test results at trial, and takes issue with others for the first time on this appeal.
 
 
 40
 As to these claims, we find no error warranting reversal. Any confusion with regard to the nature and scope of plaintiff's impairments cannot be said to have affected the jury's finding of liability. The jury returned a single special interrogatory on October 14, 1991. To the question, "Was the defendant, Norfolk & Western Railway Co., negligent on March 16, 1988, as alleged by the plaintiff?" the jury responded, "No." J.A. at 90. Since the jury found N & W to be not negligent, it did not have to go on to determine to what degree Snyder's health problems were caused by the accident. In short, Snyder has not made the requisite showing to warrant reversal here.
 
 B. More Prejudicial than Probative
 
 41
 Snyder argues that the prejudicial effect of certain statements in the medical records substantially outweighed their probative value, if any. To put his argument most strongly, the jury was permitted to consider certain evidence that prejudiced it against him while adding little or nothing to the resolution of issues at trial. This prejudice was so strong that it swayed the jury's finding of liability. Snyder objected to some prejudicial evidence at trial, and did not object to other such evidence.
 
 
 42
 We find neither any abuse of discretion nor plain error in the admission of the allegedly prejudicial evidence. Of the potentially prejudicial evidence admitted, we feel that only evidence concerning Snyder's concern over passing bad checks, his previous divorces, and his actions while intoxicated warrants further discussion.
 
 1. Bad Checks
 
 43
 Snyder objected to the evidence in the medical records about his concern over passing bad checks. See id. at 533. The stated grounds for this objection were that this evidence is more prejudicial than probative. See id. at 533-34. The judge overruled Snyder's objection, stating that this evidence "[m]ay have some bearing on his emotional or mental state at the time. He is claiming all of his depression came from the accident." Id. at 533.
 
 
 44
 The district court did not abuse its discretion in so ruling. Snyder was seeking damages for "mental anguish," id. at 9 (Snyder's Complaint), or, "mental pain and suffering," id. at 284 (counsel for Snyder's opening argument). To the extent, then, that Snyder's "bad check predicament," id. at 263, went to mitigation of damages, it was relevant in a non-bifurcated trial. The prejudicial effect of this evidence was muted by the fact that it is but a passing reference buried within pages upon quires upon reams of medical records. See Snyder's Br. at 10, 17 (referring to the admitted medical records as "voluminous"). Snyder has not maintained that this reference was specifically brought to the jury's attention. In sum, it was not an abuse of discretion to admit this evidence.
 
 2. Previous Divorces
 
 45
 Snyder objected to the admission of evidence concerning previous marriages. See J.A. at 504. The judge admitted the evidence. It might be argued that Snyder's fear of yet another divorce upon returning to alcohol abuse aggravated his mental anguish in the wake of his accident. Thus, the evidence arguably went to mitigation of damages. Given the fact that Snyder's alcohol-related marital problems were raised during Snyder's case-in-chief and the fact that the small portions of the voluminous medical records specifically referring to Snyder's previous divorces were not specifically brought to the jury's attention, the prejudicial effect of this evidence seems minimal. Thus, there is no abuse of discretion here.
 
 3. Behavior While Intoxicated
 
 46
 The lone reference to Snyder slapping his wife, see id. at 186, seems the most prejudicial of all admitted evidence. In context, the statement is a response by a counselor to Snyder's experience with blackouts. The handwritten record reads: "Client relates to having a couple of blackouts twice a week. Slapped his wife and doesn't remember it." Id.
 
 
 47
 Apparently, Snyder made no specific objection to such references to his intoxicated behavior. See id. at 517-22. We thus review for plain error. Given that the statement is a passing reference in the midst of voluminous records, and that the statement in question is difficult to find even when directed to it in the record and was never brought to the jury's attention, we find that Snyder has not met his extraordinarily high burden of showing plain error.
 
 
 48
 In summary, whether viewed in separate units or as a whole, we find no error warranting a new trial, given the standards by which we are to review the record.
 
 
 49
 C. Alleged Stipulations regarding Psychological Testimony
 
 
 50
 Finally, Snyder asserts that the parties had agreed not to introduce "psychological testimony." See id. at 540. He states that such testimony was introduced in the form of medical records, that this evidence "ambushed" him, and that the admission of this evidence constitutes an abuse of discretion. Snyder's Br. at 18. Snyder argues that he was "prejudiced by the admission of surprise testimony," and that "a new trial is therefore necessary to rectify the injustice." Id. at 19.
 
 
 51
 N & W responds that the agreement between the parties did not concern portions of hospital records dealing with psychological matters. The parties had merely agreed not to offer the testimonies of their psychologist expert witnesses. Moreover, Snyder himself, his wife, and his treating doctor all testified to Snyder's psychological reaction to his injuries.
 
 
 52
 Snyder's argument is not supported by the record. N & W's is. We thus reject Snyder's last contention.
 
 
 53
 AFFIRMED.
 
 
 54
 RYAN, Circuit Judge, concurs in the judgment only.
 
 
 
 [1]
 Snyder refers to an eighth set tht was apparently withdrawn by N & W and not offered into evidence. See Snyder's Br. at 12 (discussing Exhibit 'Q-1"); N & W's Br. at 10